IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| INTERNATIONAL PAPER COMPANY and | § | CIVIL ACTION NO. 11-CV-00017 |
| FACTORY MUTUAL INSURANCE | § | |
| COMPANY, | § | |
|      Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | JUDGE STAGG |
| DEEP SOUTH EQUIPMENT COMPANY, | § | |
| NACCO MATERIALS HANDLING | § | |
| GROUP, INC., OSRAM SYLVANIA | § | |
| INC., RST INSURANCE COMPANY, | § | |
| UVW INSURANCE COMPANY, and XYZ | § | |
| INSURANCE COMPANY, | § | MAGISTRATE JUDGE HORNSBY |
|      Defendants, | § | |

**MEMORANDUM IN RESPONSE TO DEEP SOUTH EQUIPMENT
COMPANY'S AND NACCO MATERIAL HANDLING
GROUP'S MOTIONS TO STRIKE/DAUBERT
CHALLENGE OF PLAINTIFF'S EXPERT, JOHNNY THORNTON**

**MAY IT PLEASE THE COURT**:

Now into court, through undersigned counsel, comes International Paper Company ("**IP**")
and Factory Mutual Insurance Company ("**FMIC**"), who in opposition to the Motions to
Strike/Daubert Challenge of Plaintiff's Expert, Johnny Thornton filed by defendants Deep South
Equipment Company and Nacco Materials Handling Group (collectively the "**Defendants**")
respectfully submit the following:

**I.**    **Introduction**.

The purpose of Rule 702 of the Federal Rules of Evidence, as interpreted by *Daubert v.
Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), is to ensure that those

persons who are allowed to give opinion testimony are qualified in the field in which they are testifying, that their testimony is reliable and that their testimony is relevant to the facts of the case before the court.  Mr. Johnny Thornton is a qualified expert in the field of fire cause and origin, the methods he utilized in this case were reliable and the conclusions he has drawn will assist the trier of fact to understand the evidence in this case.

## II.      Law and Analysis.

### A.      Fed.R.Evid. 702 should be construed liberally to include reliable and relevant testimony of expert witnesses.

While the Court in *Daubert*, reaffirmed the role of the court as gatekeeper, it likewise noted the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert* 509 U.S. at 588 citing *Beach Aircraft Corp. V. Rainey*, 488 U.S., at 169, 109 S.Ct., at 450 (citing Rules 701 to 705).  Further, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." The Advisory Committee Notes, 2000 Amendments to Fed.R.Evid 702.  There are baseline standards of reliability and relevance which must be met, however the "Daubert analysis should not supplant the trial on the merits." *Pipitone v. Biomatrix, Inc.* 288 F.3d 239, 250 (5th Cir.2002).  "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Fed.R.Evid. 702 Advisory Committee Notes, 2000 Amendments citing *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996).

An inquiry under Fed.R.Evid. 702, as interpreted by *Daubert* and its progeny, involves a three step process.  The first step requires a determination that a person is an expert by virtue of his knowledge, skill, experience, training or education. After that hurdle, the court should engage in a

two part analysis: "1) determining whether the proffered testimony is reliable, i.e. assessing whether the reasoning or methodology underlying the testimony is scientifically valid, and 2) determining whether that reasoning or methodology can be properly applied to the facts in issue; that is whether it is relevant."  *See Deep South's Memorandum in Support of its Motion to Strike*, Page 3 citing *Curtis v. M&S Petroleum, Inc*. 174 F.3d 661 (5th Cir. 1999).  Thus, to shorten the inquiry; 1) is a person an expert, 2) is his testimony reliable from a scientific or technical perspective and 3) is his opinion relevant to the facts of the case at bar.

In the matter before the court, Defendants seek to exclude the testimony of Johnny Thornton based upon two purported deficiencies, both of which deal with the second step of the test, reliability.

> "Deep South Equipment Company ("DEEP SOUTH") moves this Honorable Court to strike or otherwise exclude, under *Daubert*, ..... expert, Johnny Thornton, on grounds that his opinions are based on (1) **inadequate facts and data** and 2) **are not the result of a reliable application of any principles and methodologies of NFPA 921 to the facts of this case**..."  *See Deep South's Memorandum in Support of its Motion to Strike, Page 1*.  (Emphasis Ours)

While those are two proper areas for inquiry under *Daubert* and will be addressed herein, the attack on Mr. Thornton's qualification as an expert when such was not raised in Defendants' Motion to Strike is unnecessary and a back door attempt to influence the court on the issue of reliability.

**B.**    **The legal standard to qualify an expert in a particular field is based upon knowledge, skill, experience, training or education and the inquiry should be a minimum standards test.**

While Defendants' Motion to Strike does not seek to disqualify Mr. Thornton as an expert, in view of the fact that Defendants addressed such issues in their Memorandum in Support of their Motion to Strike, plaintiffs will respond.  It is important to note that Defendants cite neither statutory

---

nor jurisprudential authority setting forth the standard for qualifying a person as an expert witness.

Fed.R.Evid 702 states in pertinent part "[I]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, **a witness qualified by knowledge, skill, experience, training or education**, may testify thereto in the form of an opinion or otherwise." *Emphasis Ours*.   While Plaintiff feels that Mr. Thornton's qualifications as an expert in the field of fire cause and origin are superior, the bar that he needs to meet to qualify as an expert do not require that he be "highly qualified in order to testify about a given issue." *Huss v. Gayden*, 571 F.3d 442,452 (5th Cir. 2009).  Further,

> "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact. The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification.  Such lack of familiarity affects the witness' credibility, not his qualifications to testify." *Davis v. Combustion Engineering, Inc*. 742 F.2d 916, 919 (6th Cir. 1984).

Mr. Thornton began his career as a firefighter in 1963, was promoted into the position of fire investigator captain level in 1976, and upon his retirement in 1986, formed a private company dedicated to fire/explosion examinations and investigations.  His career spans over 45 years and he has been called to testify regarding his area of expertise over seventy times. Notwithstanding Defendants' attack on Mr. Thornton's certifications at the time he prepared his report, his knowledge, skill, experience and training are sufficient to qualify him as an expert in the field of fire cause and origin.  *See Report and CV of Johnny Thornton attached as Exhibit "A."*

Defendants spend four pages of their Memorandum in an attempt to disqualify Mr. Thornton as an expert witness. They do not however, cite any case law or statutory authority in support of their contention. The sole applicable inquiry that the court should engage in at this point in the analysis

---

involves a determination of whether Mr. Thornton is an expert in fire cause and origin based upon his knowledge **or** skill **or** experience **or** training **or** education. Any reference by Defendants to his report or the publications, standards, methods or principles he used in his analysis are irrelevant to the above inquiry.

Initially, Defendants contend that because Mr. Thornton let his certification as a fire investigator lapse, he is no longer an expert.  This is followed with the assertion that Mr. Thornton does not qualify as an expert because "did not utilize it [the 2011 version of  NFPA 921] when formulating his opinions" because he does not own a copy of the 2011 version of NFPA 921. *See Deep South's Memorandum in Support of Motion to Strike*, Page 8.  Neither assertion is a valid reason for his disqualification as an expert.

"A witness who is otherwise qualified is not disqualified for his lack of credentials." *McCoy v. Whirlpool Corp*., 214 F.R.D. 646, 650 (D.Kan.2003).  The aspersions cast against Mr. Thornton regarding his credentials by Defendants  are merely an attempt to divert the Court's attention away from Mr. Thornton's knowledge, skill, experience, training and education. Those factors are the true basis of his expertise.  Further they are the basis of obtaining the certifications in the first place and should be the sole focus of the inquiry.  Mr. Thornton let his Texas private investigator's license lapse after his investigation, but eight days before his report was drafted, which has no bearing on his knowledge of  fire investigations, rather it is a prerequisite to conducting fire investigations in the State of Texas. *See  Affidavit of Johnny Thornton attached as Exhibit "B."*  Mr. Thornton previously held his certification as CFEI but allowed it to lapse for failure to pay his dues when Hurricane Ivan hit Texas,  greatly affecting his business.   He has  subsequently  regained his

certification. *See Affidavit of Johnny Thornton attached as Exhibit "B."* To the extent that Defendants argue that Mr. Thornton needs the CFEI certification on top of his experience and training, this is a factor that goes to the weight and not the admissibility of his testimony. *Huss*, 571 F3d. At 452.

In the second area of its attack on Mr. Thornton's qualifications, Defendants have put the proverbial cart before the horse. Defendants argue that because Mr. Thornton **allegedly** did not follow the methodology set forth in the 2011 version of NFPA 921, he should not be qualified as an expert. There are two major flaws with that line of reasoning. The first is that the methodology of the expert is tested **after** the person is qualified as an expert. It is the basis for the "reliability" prong according to *Daubert*. "The reliability prong mandates that expert opinion be grounded in the methods and procedures of science ..." *Johnson v. Arkema Incorporated*, 685 F3d. 452, 459 (5th Cir. 2012) citing *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Conversely, the inquiry into the qualification of a witness as an expert is engaged in **prior to and without regard** to his opinion and is based upon knowledge, skill, training, experience or education. Once a person is qualified as an expert, the inquiry can begin into the reliability of his opinions based upon the methods he used in arriving at such opinions.

The second flaw is that under Defendants' reasoning, only an expert who complied with the version of NFPA 921 in effect at the time he issued his report would be qualified to be an expert. **There is no such requirement under Fed.R.Evid 702, nor is there jurisprudence which states the above**. To follow such reasoning would negate the necessity of the reliability prong of Fed.R.Evid. 702. Further, such logic would lead to the circular argument that in order for a person

to qualify as an expert, he must follow certain methodology and an expert that followed such methodology would *per se* be reliable because the court would have already tested his reliability in order to qualify him in the first place.  How then would a party retain an expert?  The expert would have to complete his report before a party could determine whether he could be qualified as an expert. The proper *Daubert* analysis requires three steps, the first of which is to determine whether a person has the necessary knowledge or skill or experience or training or education in the applicable field.  That is the sole inquiry necessary on qualification as an expert and Mr. Thornton meets those requirements.

> C.    **Fed.R.Evid. 702 and *Daubert* require that in order to satisfy the reliability prong of the inquiry the opinions of the expert be grounded in the methods and procedures of science.**

Defendants are improperly attempting to steer this court to the pre-*Daubert* concept of "general acceptance" by stating that the 2011 version of NFPA 921 is the sole acceptable method of determining the cause and origin of fire.  According to the 2011 version of NFPA 921, "[t]he purpose of this document is to establish **guidelines** and **recommendations** for the safe and systematic investigation or analysis of fire and explosion incidents." *See 2011 NFPA Excerpts attached as Exhibit "C." Pg. 921-8.*  In order to accomplish its stated purpose, NFPA 921 sets forth a basic method, which is in fact, based upon the ages old "scientific method," not some new formula which was conceived by the technical committee of NFPA.  The concept here is that NFPA 921 was **derived from** the scientific method; scientific method was not derived from NFPA 921.

*Daubert* and its progeny focus on methodology in order to determine reliability.  "[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings

and conclusions are based upon the scientific method, and, therefore, are reliable." *Johnson v. Arkema, Inc*., 685 F.3d 452 at 459, (5th Cir. 2012) citing *Curtis*, supra at 668.  Defendants would have the court find that the 2011 version of NFPA 921 is the only acceptable method of determining fire cause and origin.  It should be noted, that the 2014 version of NFPA 921 has now been published which begs the question under Defendants' logic, would any investigation undertaken pursuant to the 2011 version of NFPA 921 be sufficient.  The obvious answer is yes. Any changes to NFPA 921 could be the subject of cross examination of the witness to determine the sufficiency of his investigation and would go to the weight of such testimony.

> **D.    Despite contentions to the contrary, the methods utilized by Mr. Thornton in his investigation and analysis were consistent with those recommended under NFPA 921.**

Notwithstanding the fact that Mr. Thornton did not cite the 2011 version of NFPA 921 in his report, the methods that he utilized in arriving at his opinions were based on the scientific method, which is the basis of all versions of NFPA 921.  Mr. Charles R. Watson is a senior fire investigator employed by SEA Limited in Atlanta Georgia and is the Chairman of the Technical Committee on Fire Investigations which presides over the guidelines published in NFPA 921.  Mr. Watson is a Certified Fire Investigator through the International Association of Arson Investigators and a Certified Fire and Explosion Investigator through the National Association of Fire Investigators. He has reviewed both the report of Johnny Thornton as well as his deposition.  He concluded that Mr. Thornton "**applied the principles of the scientific method** in connection with his investigation," "the **scientific method is the appropriate and accepted methodology** for fire investigation," and that "**his [Mr. Thornton's] investigation should be considered reliable** from

a standpoint of the procedures followed." *See Affidavit of Charles R. Watson attached as Exhibit* "D."  In his role as Chairman of the Technical Committee which promulgates NFPA 921, Mr. Watson is unquestionably the proper person to determine whether the guidelines set forth in NFPA 921 were met. The inquiry into the reliability of the methods utilized by Mr. Thornton should end here.

### E.   The methods utilized by Mr. Thornton were consistent with the Scientific Method.

In Sections 2.I. through 2.VII. of their Memorandum, Defendants has conveniently picked incomplete portions of Mr. Thornton's deposition, his report and the depositions and reports of others in an attempt to convince the court that Mr. Thornton's methods were not sound.  These assertions repeatedly use the phrase "failed to consider and eliminate."  The methods set forth under NFPA 921 recommend that the investigator consider all of the various hypotheses and eliminate only those that are not supportable (or refuted) by the facts discovered through further examination." *See Exhibit "C."* Pg. 921-173.  For all that remain (were not eliminated), the investigator should apply the scientific method to determine the possibility or probability that they were the cause of the fire. Specifically the 2011 version of NFPA 921 directs the investigator to test each hypothesis.

> 18.6    Testing the Cause Hypothesis.  Each of the alternate hypotheses that were developed must then be tested using the Scientific Method.  If one remaining hypothesis is tested using the "scientific method" and is determined to be probable, then the cause of the fire is identified. (*See Exhibit "C."Pg. 921-173*)

The NFPA 921 gives further guidance as to how to test the hypotheses.

> 18.6.2  Deductive Reasoning.  Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all the known facts as well as the body of scientific knowledge associated with

the phenomena relevant to the specific incident.   Ultimately, the cause determination is arrived at through the testing of cause hypothesis.  (*See Exhibit "C."Pg. 921-173*)

4.3.6   (in pertinent part) A hypothesis can be tested either physically by conducting experiments or analytically by applying scientific principles in "thought experiments." (*See Exhibit "C."Pg. 921-18*)

In other words, the investigator is to apply his knowledge, skill, experience, training and education to the physical evidence and witness testimony to compare against the hypothesis to determine the likelihood that each such hypothesis actually occurred.  Again, the 2011 version of  NFPA 921 gives further guidance on how to categorize the results of the testing in association with the investigator's opinion.

4.5.1   The investigator should know the level of certainty that is required for providing expert opinions.   Two levels of certainty commonly used are probable and possible:

(1)   Probably.  This level of certainty corresponds to being more likely true than not.  At this level of certainty, the likelihood of the hypothesis being true is greater than 50 percent.

(2)   Possible.  At this level of certainty,  the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypothesis are equally likely, then the level of certainty must be "possible."

4.5.2   If the level of certainty of an opinion is merely "suspected," the opinion does not qualify as an expert opinion.  If the level of certainty is only "possible," the opinion should be specifically expressed as "possible." Only when the level of certainty is considered "probable" should an opinion be expressed with reasonable certainty. (*See Exhibit "C."Pg. 921-19*)

If Mr. Thornton is able to determine one cause that is "probable,"  which means that it is greater than fifty percent, then he is able to give an opinion.  The fact that Mr. Thornton does not find that any of the other alleged causes rises to a level above possible, does not mean that he did not

consider them, it merely means that he did not find any one of them probable.

As will be more specifically addressed below, Defendants' use of the phrase "failed to consider" is not accurate.   Further, Defendants' insinuation that each hypothesis must be "eliminated" is misleading.  Some hypothesis may be eliminated, while others may be found to be "possible" but not "probable."    The conclusions that Mr. Thornton has drawn based upon the application of his expertise to the physical evidence and witness statements do not belie that his methods were flawed.  Each one of Defendants' contentions will be addressed in turn.

1.    <u>Conflict of Testimony Between Cleo Wilson and Evan Bowers</u>.  It is Mr. Thornton's job to sift through, analyze and evaluate not only the physical evidence, but the witness testimony based upon his knowledge, skill, experience, training and education. The fact that Mr. Thornton did not stop his inquiry, the moment he heard conflicting testimony, does not mean that he did not consider it.  He merely looked at all of the evidence to draw a conclusion.

Defendants point to only two of the early witnesses on the scene, when in fact, there were at least four witnesses identified and deposed. Greg Charles was the first person at the actual scene of the fire. In fact, it was he who alerted Mr. Wilson and Mr. Anderson of the existence of the fire. Mr. Charles testified "I mean that the forklift itself was on fire, the engine compartment" *See Exhibit "E." Charles Depo Pg. 88, Lines 3-4* and "So I ran down to it. I looked at the forklift and the engine compartment was on fire.  And I ran in the office, and I told Cleo and Sando, we got a fire." *See Exhibit "E." Charles Depo Pg. 88, Lines 17-20*.  According to Mr. Anderson "[t]he fire was under the lift coming from behind the lift and in front of the lift by the blades." *See Exhibit "F." Excerpts from Anderson Depo Pg. 54, Lines 13-14*.  According to Mr. Wilson, the fire was "close by the front

of the lift right there by the tire." *See Exhibit "G." Excerpts from Wilson Depo Pg. 76, Lines 15-16.* Mr. Bowers is the only witness who said the fire was 10 feet away from the fork lift and according to Mr. Charles, he was the last to arrive. *See Exhibit "E." Charles Depo Pg. 93, Lines 22-23.* Again, Mr. Thornton's job is to analyze witnesses testimony, physical evidence and reports to draw a conclusion.

> 2.  <u>Mr. Thornton did consider the frictional effects of pushing bales, wire entanglement and sparks from the clamps as originating sources of the fire.</u>  Defendants do not like the conclusion so they are attacking the methodology utilized to reach the conclusion.  Mr. Thornton's report states as follows:

> Wire was found to have bound to the undercarriage system of the wheel/axle assembly. The wire was the size associated with the bales of paper goods being stored. The examination of the undercarriage revealed no evidence of extended portion(s) of that type wire. Dragging or rubbing of this type wire may be associated with friction heating for ignition.  Based upon the definitive directional and/or intensity type burn patterns localized fire damage and the above listed process, there was no evidence that would support a theory of this type of ignition. *See Exhibit "A." Thornton Report Pg. 11.*

Further, he stated in his deposition, "[t]he whole analytical process of the sequence of the fire discovery would eliminate that it was a spark from an wire dragging or even lift – the forks, the squeezer forks." *See Exhibit "H." Excerpts from Thornton Depo pg. 335, lines 17-20.*   These are not the statements of a person who failed to consider the possibility, but one who considered it, analyzed the evidence and eliminated it.  The method is what is being tested here, not the conclusion. "The focus should not be on the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Pekarek v. Sunbeam Products, Inc.* 672 F.Supp.2d 1161 at 1168 (D.Kan.2008) citing *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227 at 1233 (10th Cir. 2004).

3.      <u>Mr. Thornton did consider the Metal-Halide Light Fixture as an originating source of the fire</u>.  Defendants have attempted to find fault in Mr. Thornton's methodology because he allegedly failed to "conclusively eliminate" the failure of a Metal-Halide light fixture above the origin of the fire.  This assumes a standard which is not applicable under NFPA 921.  The standard in order to issue an opinion is "probable."

Defendants contend that Mr. Thornton's opinion is in conflict with Plaintiff's electrical engineer, Forest Smith's testimony.  This is simply not the case.   Mr. Smith's report and supplemental report clearly state that he opines that the lighting fixture and lamp located above the subject Hyster forklift were not the cause of the fire.  *See Exhibit "I." Forrest Smith Report Pg. 17 and Supplemental Report Pg. 1.*   Under questioning from Defendants and in keeping with the scientific method, Mr. Smith conceded that the event was "possible," however,  the fact that he concluded that it was not "probable" is evident from his report.

Defendants seem to have difficulty with the concept that "possible" or more than one "possibility" can exist in concert with "probable" given the same set of circumstances and evidence.  Possible means that it **could have happened** and probable means that, more likely than not, it **did happen**.  As discussed above, NFPA 921 contemplates this exact type of situation.  When there are more than one hypotheses which can not be eliminated, the investigator is to test each one of them.  If one rises to the level of probable, then the expert is allowed to opine on such.  Probable and possible exist in the same scenario and the fact that one explanation is possible, does not foreclose on another explanation as being probable.

4.      <u>The date of Forest Smith's report is not indicative of when he expressed his opinion</u>

to Mr. Thornton.  Defendants attempt to create an issue where none exists with regard  Mr. Thornton's report because it is dated prior to Mr. Smith's report.  Mr. Smith's report was dated 28 days after Mr. Thornton's report, however Mr. Smith states on page 17 in his report that he consulted with Mr. Thornton. *See Exhibit "I." Smith Report Pg. 17*.  Likewise, Mr. Thornton confirms this in his expert report dated September 14, 2012.

> The light fixture was observed, collected and preserved for inspection(s) as may have been required or requested.  Based on the directional and/or intensity type burn patterns found at the general area of origin, this fixture was not suspected as the source of the heat of ignition or the cause of this fire.  **These findings were confirmed as being the opinion of the electrical engineer involved with this examination**. (*See Exhibit "A." Thornton Report Pg 8*) (Emphasis Ours)

Mr. Thornton clearly consulted with Mr. Smith which is entirely consistent with the scientific method.  He considered the possibility and based upon data collected determined that it was not a probability.

    5.    Mr. Thornton did not fail to consider lightning as a potential originating source of the fire.  Mr. Thornton clearly lists lightning as a potential source of heat for ignition in his report.  "Lightning strike. There was no evidence of lightning activity in the area." *See Exhibit "A." Thornton Report Pg. 11*. Again, Defendants use the term "failed to consider" when it is clear that Mr. Thornton did consider the possibility.  Defendants acknowledge in their own Memoranda that Mr. Thornton obtained the STRIKEnet report for the day of the fire.  Further in his deposition, they question Mr. Thornton about his walking the perimeter of the scene and he states that a lightning strike is one of the things included in what he is looking for. *See Exhibit "H." Excerpts from Thornton Depo Pg. 182, lines 12-19*.  Interestingly, the fire occurred at an open walled structure, in which one worker was under the structure (Charles), two workers in the office (Anderson and

Wilson) and one worker outside the structure (Bower), along with a number of truck drivers waiting to deliver their loads and not one person mentioned a lightning strike at the time of the fire.  The fact that Mr. Thornton did not find credible evidence of a lightning strike as a source of heat for ignition, does not mean that he did not consider it. Obviously he did and determined that it was not probable.

6. <u>Mr. Thornton did consider the possibility of unauthorized smoking as a possible cause of the fire</u>.  Mr. Thornton clearly lists unauthorized smoking as a potential source of heat for ignition in his report. "Careless Smoking. This factor was eliminated by the fact that the lift truck operators working in the storage facility did not smoke." *See Exhibit "A." Thornton Report Pg. 11*.  Again, Defendants use the term "failed to consider" when it is clear that Mr. Thornton did consider the possibility. In fact, Defendants questioned Mr. Thornton about his analysis of unauthorized smoking extensively in his deposition. *See Exhibit "H." Excerpts from Thornton Depo Pgs. 190-195*.  He considered it and based upon his investigation of the physical evidence and the witness statements, he determined that it was not probable.

7. <u>The concept of a "hot bale" was not dealt with specifically in Mr. Thornton's report.</u>  Defendants previously makes much of the fact that other "possibilities" should have been known because depositions were available to Mr. Thornton at the time of his report.  The deposition in which the "hot bale" was first mentioned was ten months after his report was issued. This is yet another attempt by Defendants to throw mud at the wall and see what sticks.  Based upon witness testimony and physical evidence, Mr. Thornton determined that the origin of the fire was in/under the fork lift.  Clearly there was not a bale under the fork lift, nor was there a bale on the fork lift which could have dropped cinders under the fork lift. Mr. Thornton's report, likewise did not address

the specific possibility that the fire was caused by a flaming arrow shot by a rogue band of the Coushatta tribe of Indians.  That does not mean his methodology is flawed.  The report was gleaned from applying his knowledge, skill, experience, training and/or education to physical evidence and witness testimony to determine possible source of ignition of the fire.  Each possibility was analyzed using the above resources within the structure of the scientific method to determine if any single possibility rose to the level of probability.  Mr. Thornton determined that one possibility was a probability and has thus set forth his opinion in his report.

**F.** **The ignition temperature of paper is a fact and not subject to methodology**.

Defendants have attempted to mis-lead the court in its Memoranda by stating that "[n]otably, his [Mr. Thornton's]  methodology in determining that [the ignition temperature of paper] was to do a Google search" when in fact Mr. Thornton said "**you** can do Google searches."  *See Exhibit "H." Excerpts from Thornton Depo Pg. 160, Line 10*. Google is an internet search engine, an electronic librarian as it were, which identifies internet data bases containing information within the parameters of the terms entered.  Section 18.6.4.1 of the 2011 version of NFPA 921 entitled "**Scientific Literature**" states in pertinent part "Gateways to the scientific literature can include **Internet data bases**, technical libraries, textbooks and handbooks."  *See Exhibit "C." Excerpts from NFPA 921, Pg. 173* (Emphasis Ours).

When questioned if he had any information in his file to substantiate his opinion that the ignition temperature of paper was 451 degrees (he never said it was 451 degrees), he replied

> As I stated earlier, I testified to my file and my work experience and things that I have studied over some 40 years, 450 degrees Fahrenheit is the ignition point of an ordinary combustible. And it is in that range. *See Exhibit "H." Excerpts from Thornton Depo Pg. 160, lines 15-22.*

Defendants questioned Mr. Thornton about the ignition temperature of paper from page 158 of his deposition to page 172 of his deposition and he consistently replied that it was in the range of 450 degrees Fahrenheit and further qualified his answer by stating that the condition/makeup of the paper and other factors could affect the ignition temperature.  *See Exhibit "H.", Excerpts from Thornton Depo Pg 158-172.*

While Defendants' assertion is that Mr. Thornton's "methodology" is flawed, what they are really insinuating is that the scientific data upon which he is testing his hypothesis is incorrect. Testing the hypothesis is part of the scientific method which they accuse Mr. Thornton of not following.  Interestingly, Defendants do not ever directly assert that the data is incorrect, nor do they provide any conflicting data.   Defendants will have plenty of opportunity to cross examine Mr. Thornton at trial regarding his opinion and the basis of those opinions.  Unsubstantiated attacks on the scientific data used by Mr. Thornton, however should not be a basis for questioning his methodology.

> **G.     Mr. Thornton did address the basis for his opinion regarding the second fire in his report and supports his conclusions with regard thereto.**

Defendants are incorrect in their assertion that the two lines cited by them in their Memoranda was Mr. Thornton's only mention of the second fire in his report.  In addition to the actual opinion cited by Defendants, the majority of page 4 and the top portion of page 5 of Mr. Thornton's report address the second fire. *See Exhibit "A." Thornton Report Pgs 4-5.*  Mr. Thornton addresses the state of the scene of the original fire, the fact that it was still smoldering, the temperature, wind conditions, precipitation present on that day and most importantly witness testimony.

**H.      Mr. Thornton did not engage in either Expectation Bias or Confirmation Bias.**

1.      <u>Expectation Bias</u>.  While expectation bias is a danger in a fire investigation, Mr. Thornton was not guilty of such a lapse as is evident from his report and from his deposition. In the *Chester Valley Coach Works v. Fisher Price*, Inc. 2001 WL 1160012 (E.D.Pa. 2001) case cited by Defendants, the investigator was found **not to have conducted** a site inspection, interview witnesses or review the transcripts of two eyewitnesses to the fire. Further he testified that he was retained to determine if Bigfoot #1 and #2 could have started the fire.  The conduct of the investigator in the *Chester Valley Works* case is nothing like the investigation conducted by Mr. Thornton. Defendants specifically questioned Mr. Thornton regarding his site inspection, his interview with Greg Charles, the depositions he reviewed and his coordination with other experts retained by Plaintiffs, including Mr. Forest Smith and Mr. Robert Friedemann.

There are two portions of Mr. Thornton's report which Defendants point to in support of their contention of expectation bias.  The first is a sentence contained in the "Property Description" portion of the report in which Mr. Thornton states "The fire started in an area described as the *"D" Aisle*, near the North to South main drive aisle."  Defendants failed to include the next sentence which states "[t]his area is referenced as a *general area* of origin, which will be discussed in more detail in subsequent paragraphs." *See Exhibit "A." Thornton Report Pg 3*. The report is dated September 14, 2012.  Mr. Thornton obviously had reached his opinion as of the date of the writing of the report as is evidenced by the fact that later in the report, he specifically states his "conclusions and/or opinions."  This is further supported by the fact that in the last paragraph under the "Assignment" portion of his report (which was before the "property description" section), Mr.

Thornton states:

> Based on observations of this loss and my training and experience, it was the conclusion that the cause of the above captioned loss should be considered and/or classified as accidental, due to paper product coming in contact with the heat of the exhaust manifold of the Hyster 80. (*See Exhibit "A." Thornton Report Pg. 1*).

Obviously the report is to be taken as a whole, and unless particular language was specifically qualified or limited by date, time, or circumstances, the report indicates his findings as of the end of his investigation.

The second portion of Mr. Thornton's report, which Defendants contend demonstrates expectation bias is more properly an argument for "confirmation bias" and is unfounded.  Defendants contend that Mr. Thornton's report does not properly document the ignition temperature of ordinary combustibles nor the heat of the manifold of the forklift.  This Response Memorandum has already dealt with the issue of the ignition temperature of paper and the fact that Mr. Thornton did not specifically set forth such scientific data in his report does not make his report flawed.  Defendants clearly questioned him about it in his deposition and shall have the opportunity to do so again at trial.

With regard to the temperature of the manifold, Mr. Thornton's report states:

> During the site inspection(s) and subsequent examinations of items of evidence all of the potential source(s) of heat for ignition was considered and/or thoroughly evaluated.  **This evaluation process was conducted with other investigative groups/experts**. (Emphasis Ours) *See Exhibit "A." Thornton Report Pg. 5.*

The methodology utilized was further explained as follows:

> The opinions and/or conclusions reached were based upon the entire process of this examination, my training and experience.  The scope of the examination included but was not limited to, scene examinations, the interviews of witnesses, review of depositions and **discussions with experts from fields of expertise as needed** has

led to the following conclusions and/or opinions. (Emphasis Ours) *See Exhibit "A."*
*Thornton Report Pg. 10.*

When questioned in his deposition about where in his report there was documentation on the heat
of the manifold, Mr. Thornton stated: "[t]he research that was done on that will be better explained
by Robert Friedemann." He further states "I haven't seen Robert Friedemann's report in my file —
but I think I've seen it and he does have it documented." *See Exhibit "H." Excerpts from Thornton*
*Depo Pg. 165, Lines 12-22.* Clearly Mr. Thornton consulted with another expert to determine the
heat of the manifold which is the subject of another expert report.  Mr. Thornton's failure to include
in his report the specific scientific data he relied upon, does not make his report flawed by either
expectation or confirmation bias.

       2.   <u>Confirmation Bias</u>. Defendants misconstrue the concept of "confirmation
bias."  As stated in their Memoranda citing NFPA 921 "[c]onfirmation bias occurs when the
investigator instead tries **to prove the hypothesis**. This can **result** in failure to consider alternate
hypotheses." *See Deep South Memorandum Pg. 27.*  Deep South is attempting reverse the formula
and state because Mr. Thornton allegedly did not consider alternate hypotheses, he was trying to
prove his hypothesis. They have cited nothing in his deposition or his report which supports the
contention that Mr. Thornton was trying to prove his hypothesis.

       The above notwithstanding, the  argument put forth by Defendants is merely a combination
of all of the various assertions set forth in Section 2 of Deep South's Memorandum re-urged under
a different name. As each assertion was individually controverted above, they should be given no
additional consideration when combined.  Defendants repeatedly asserted that Mr. Thornton "failed
to consider" when in fact his report clearly indicates he did consider the various other potential

hypotheses and he either eliminated them or determined that they were not probable. This is not consistent with confirmation bias.

I.      **The Court should allow Mr. Thornton to testify as a fire cause and origin expert and to the extent Defendants disagree with his testimony, it should be resolved through the trial process.**

It is evident in the structure of our legal system that courts recognize that reasonable minds may differ and the legal process is designed to address that.  To the extent that Defendants take a position that is different from the conclusions drawn by Mr. Thornton, the trial is the proper forum to raise their differences.

> Once the thresholds of reliability and relevance are met, the testimony is admissible. Thereafter, any purported weakness in an expert's methodology or conclusion goes to the degree of credibility to be accorded to the evidence, not to the question of admissibility. *Royal Insurance Company of America v. Daniel*, 208 F.Supp. 423 at 426 (S.D.N.Y 2002) citing *Ambrosini v. Labarraque*, 101 F3d. 129, 133-35 (D.C. Cir. 1996).

If Defendants disagree with the testimony presented,

> Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.  *Daubert* supra at 596 citing *Rock v. Arkansas*, 483 U.S. 44 at 61, 107 S.Ct. 2704 (1987)

Further, "the fact that other causes go 'uneliminated' goes to the weight, not the admissibility, of the expert testimony." *Royal Insurance*, supra at 426 citing *Allstate v. Hugh Cole*, 137 F.Supp.2d 1283 at 1291 (M.D.Ala. 2001).  This analysis should be interpreted in light of the Advisory Committee Notes, 2000 to Fed.R.Evid. 702 which state "[a] review of the case law after Daubert shows that rejection of expert testimony is the exception rather than the rule."

III.     **Conclusion.**

Mr. Thornton is an expert in the field of fire cause and origin by virtue of his knowledge, skill, experience, training and education. He reviewed the relevant physical evidence and witness testimony and applied the scientific method to arrive at his conclusions. The assertions raised against Mr. Thornton by Defendants in their Motions address solely the issue of reliability. Plaintiff has demonstrated that Mr. Thornton's report is reliable using the guidelines set forth by *Daubert* and its progeny.

Jurisprudence says that reliability is based on an investigation in which the scientific method is utilized. Charles R. Watson, Chairman of the Technical Committee charged with promulgating NFPA 921, reviewed Mr. Thornton's report and deposition and stated that he had complied with the scientific method and his investigation should be considered reliable from the standpoint of the procedure followed. Each one of the contentions raised by Defendants questioning Mr. Thornton's methodology in its Memorandum were discussed and refuted. These contentions were refuted by reference to the exhibits Defendants attached to their own Memoranda, except for the deposition of Greg Charles, the first witness on the scene, which Defendants chose not to attach. Plaintiffs have met their burden with regard to Mr. Thornton and Defendants' Motions to Strike should be denied.

Respectfully submitted,


/s/ Robert H. Shemwell, Jr.
Robert H. Shemwell, Jr. #22616
WEEMS, SCHIMPF, GILSOUL, HAINES,
   LANDRY & SHEMWELL (APLC)
912 Kings Highway
Shreveport, Louisiana 71104-426
Phone: (318) 222-2100
Facsimile    (318) 226-5100


John C. Hart
Bruce H. Rogers
BROWN, DEAN, WISEMAN, PROCTOR,
   HART & HOWELL, L.L.P.
200 Fort Worth Club Building
306 W. 7th Street
Fort Worth, Texas 76102-4905
Tel.    817/332-1391
Fax:    817/870-2427
**ATTORNEYS FOR PLAINTIFF,**
**INTERNATIONAL PAPER COMPANY**

CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Memorandum in Response to

Deep South Equipment Company's Motion to Strike/Daubert Challenge of Plaintiff's Expert,

Johnny Thornton has been served on the following counsel of record via the Court's electronic

filing system on the __th day of March, 2014.

Gregory D. Maricle, Esq.
Brian T. Butler, Esq.
Sean M. Casey, Esq.
Maricle & Associates
III United Plaza, Suite 350
Baton Rouge, LA 70809

William M. Bass, Esq.
Kristen N. Broussard, Esq.
Voorhies & Labbe (LAF)
P.O. Box 3527
Lafayette, LA 70502

James A. Mijalis, Esq.
Lunn, Irion, Salley, Carlisle
& Gardner
P.O. Box 1534
Shreveport, LA 71165-1534

Francis J. Grey, Jr. Esq.
Sean Corigan, Esq.
Lavin, Oneil, Ricci, Cedrone
& DiSipio
190 N. Independence
Mall West, Ste 500
Philadelphia, PA 19106

/s/ Robert H. Shemwell, Jr.
Of Counsel