UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

INTERNATIONAL PAPER CO., ET AL         CIVIL ACTION NO. 11-cv-0017

VERSUS

DEEP SOUTH EQUIPMENT CO., ET AL        MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

**Introduction**

International Paper ("IP") operates a paper mill near Mansfield, Louisiana. It leased from Murphy Bonded Warehouse ("Murphy Bonded") a warehouse in nearby Red River Parish to store used paper and corrugated containers that would be used as feedstock. Tango Transport ("Tango") operated the warehouse for IP.

Tango rented a lift truck from Deep South Equipment Company ("Deep South") to use in the warehouse. The truck was built by NACCO Materials Handling Group, Inc. ("NACCO"). Several days after the truck arrived at the warehouse, an employee smelled smoke and discovered that a fire had broken out near the truck. The warehouse was destroyed.

IP had an insurance policy from Factory Mutual Insurance Company ("FM"). The insurer paid IP for its losses, including the cost of demolition and rebuilding the warehouse. IP and FM ("Plaintiffs") then filed this complaint against defendants including Deep South

and NACCO, whom they faulted for the fire. Before the court are several expert-related motions.

**Applicable Law**

Rule 702 provides that "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993).

The Daubert court provided an illustrative list of factors that courts may use when evaluating the reliability of expert testimony. Id. at 592-594. These factors include whether the expert's theory or technique can be or has been tested, whether it has been subjected to peer review, whether it has a known or potential rate of error or standards controlling its operation, and whether it is generally accepted in the relevant scientific community. Id. at 593-594. "In short, expert testimony is admissible only if it is both relevant and reliable."

Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir.2002). The Daubert factors should be applied with flexibility, and the question of whether an expert's testimony is reliable is ultimately a fact-specific inquiry. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 138 (1999); Burleson v. Tex. Dep't of Criminal Justice, 393 F.3d 577, 584 (5th Cir.2004).

**NACCO's Motion to Preclude Testimony of John Howard (Doc. 95)**

At the time of the fire, Tango owned two or three Hyster lift trucks that had been purchased from Deep South for use at the warehouse. All were purchased with a Paper Package. Tango also occasionally rented a lift truck from Deep South when the need arose. A few weeks before the fire, Tango contacted Deep South and requested an immediate short term rental of a H80FT lift truck. Tango was expecting an increase in paper volume in the coming weeks. The rented lift truck did not contain a Paper Package.

Plaintiffs do not allege that the rented lift truck was defective or that NACCO was negligent. Instead, Plaintiffs allege that NACCO, which does not sell directly to end users, failed to adequately warn their dealers that a "Paper Package" should be installed on all lift trucks operated in the paper handling industry. The Paper Package helps reduce the accumulation of paper debris in the engine compartment. The package includes, among other things, a vented hood and muffler wraps.

Plaintiffs retained John Howard ("Howard") as a human factors expert to testify in regards to their warning claim against NACCO. Howard opines that, although NACCO does recommend the use of the Paper Package when a lift truck will be operated in the paper industry, NACCO's warning information system was not emphatic enough to impress upon

dealers the need to impress upon end users the importance of using the Paper Package. Howard also opines that NACCO should not have made the Paper Package an optional component when the lift truck will be operated in a paper environment. NACCO has moved to exclude Howard's testimony.

After considering all of the lengthy submissions, the court finds that Howard's opinions regarding NACCO are not reliable, relevant, or helpful to the trier of fact. Indeed, Howard's opinions regarding NACCO will do nothing but confuse the jury. The deposition testimony shows that Deep South knew that NACCO recommended the Paper Package for an operation like Murphy Bonded. The appropriate ANSI standard does not mandate that Paper Package-type add ons be standard equipment on all lift trucks. In fact, OSHA places the responsibility on the end user to determine the appropriate equipment for its work environment. 29 U.S.C. § 654(a)(1). The is no way for NACCO, which does not sell to end users, to know how and where end users will operate its lift trucks.

NACCO has a web site for dealers to review regarding recommended options such as the Paper Package. When asked if he ever visited that site, Howard responded: "I am not a dealer." Howard at 142. There is no way Howard can accurately analyze or criticize NACCO's communications with its dealers regarding options and accessories if Howard did not bother to review those communications.

Howard also offers no alternatives to NACCO's communications regarding the Paper Package. He does not know what other manufacturers do with respect to a Paper Package. Howard at 59. He has not compared the H80FT operator's manual with manuals from other

manufacturers. And, most significantly, Howard testified that he had not put "pen to page" to describe what NACCO should do differently with respect to its communications with its dealers. Howard at 172.

Howard may be permitted to testify regarding the communications between Deep South and the end user. (Deep South has not filed a timely motion challenging Howard's opinions.) However, with regard to NACCO, Howard's opinions amount to little more than speculative guess work. Accordingly, NACCO's motion to exclude his testimony (Doc. 95) is granted.

**Motion to Strike/Daubert Challenge of Johnny Thornton (Doc. 100) and Motion to Strike Affidavits of Johnny Thornton and Charles Watson (Doc. 123)**

Deep South and NACCO (Doc. 111) seek an order excluding the testimony of Plaintiff's cause and origin expert, Johnny Thornton ("Thornton"). Thornton opines that: (1) the area of origin of the fire was within the engine compartment of the Hyster 80 lift truck that was parked in "D" aisle of the warehouse; (2) the fire was caused by ignition of paper products in close proximity to the unprotected exhaust manifold of the Hyster 80 lift truck; and (3) the fire was not caused by sparks or heat from baling wire, sparks from the forks/bale clamp, lightning, smoking, or overhead lights. Deep South and NACCO argue that Thornton's opinions are based on inadequate facts and data, are not the result of a reliable application of any principles and methods to the facts, and are per se defective under the provisions of the applicable standard, NFPA 921.

In response to this motion, Plaintiffs submitted affidavits from Thornton (the expert in question) and Charles Watson (a previously undeclared expert). Both of those affidavits were submitted after the expert report deadline in the court's scheduling order. Thornton's affidavit is an obvious attempt to correct the problems with his analysis that were identified in his deposition and the Daubert motion, specifically his failure to consider the updated version of NFPA 921. Watson's affidavit impermissibly attempts to bolster and give credibility to Thornton's opinions. Watson was never identified as an expert in this case. Deep South's **Motion to Strike (Doc. 123)** both affidavits is **granted**.

The court has serious reservations about Thornton's qualifications to testify as an expert in this case. He is no longer licensed in Texas (he let his license lapse – Thornton at 42) and has never been licensed in Louisiana (incredibly, he testified that he was told that he could "funnel" his cases – Thornton at 44). He has failed to maintain his CFEI certification; he needs 40 hours of continuing education credits to become certified. Thornton at 39. However, it is not merely Thornton's lack of certifications and licenses that disqualifies him as an expert; courts typically hold that such matters go to the weight – and not the admissibility – of an expert's testimony. Here, it is Thornton's failure to review and apply the most current version of the applicable fire investigation techniques and methodologies that, combined with his weak credentials, leads this court to exclude his opinions.

The National Fire Protection Association ("NFPA") is an international nonprofit that promotes codes and standards to minimize the possibility and effects of fire and other risks. Schlesinger v. U.S., 898 F. Supp.2d 489, 492 (E.D. N.Y. 2012). NFPA 921 ("Guide for Fire

and Explosion Investigations") is a peer reviewed and generally accepted standard in the fire investigation community. Travelers v. General Electric, 150 F.Supp.2d 360, 366)(D. Conn. 2001). It was first issued in 1992, and it is revised every three years or so due to new information and advances in science. Bunch v. State, 964 N.E.2d 274, 287-288 (Ind. Ct. App. 2012).

    Thornton purported to rely on NFPA 921 in reaching his conclusions. But his deposition testimony on this point, like much of his other deposition testimony, was evasive. When asked whether he relied on NFPA 921, Thornton stated that he relied on "knowledge of it, yes." Thornton at 34. Thornton stated that his knowledge of 921 is a "working knowledge." Thornton at 35. When asked which edition of 921 he used in this case, he testified: "As I said, I utilized my knowledge of it. The one that would be applicable may be a better question, sir." Id. He then testified: "I utilized my knowledge of 921 from the creation date with all the peer review changes that have occurred. The 2008 volume or – excuse me – publication was in effect." Id. Thornton then testified that he does not own or have a copy of most recent edition of 921 – the 2011 edition. He incorrectly stated that, "2012 was the next edition." Thornton at 36.

    Plaintiffs argue that, even though Thompson did not cite the 2011 version in his report, the methods that he used in arriving at this opinions were based on the scientific method, which is the basis of all versions of NFPA 921. Under this reasoning, Thompson could have used the original 1992 version because it, too, is (or was) based on the scientific method at the time. But the standards are revised because of advances in science.

The 2011 revisions to NFPA 921 made numerous changes to Chapter 18 ("Fire Cause Determination").  The court's side by side comparison of the 2008 version to the 2011 version shows that the 2011 version is a substantial rewrite. The 2011 version is twice as long and contains new criteria regarding the collection and consideration of data, the assessment of ignition sequencing, and the development and testing of a cause hypothesis. For Thornton to purport to rely on his working knowledge of NFPA 921, but not take the 2011 revisions into account, highlights the unreliability of his work in this matter.

The court does not hold that NFPA 921 is the only possible method to determine fire cause and origin.  But, when an expert purports to rely on NFPA 921 from the date of its creation, including all of the peer reviewed changes that have occurred, but omits the most recent and significant changes, there must be a good explanation for the omission.  Perhaps had Thorton kept up with his certifications, licenses, and continuing education, the glaring omission would not have occurred.  Accordingly, Deep South's Daubert motion (Doc. 100) that challenges Johnny Thornton (Doc. 100) is **granted**.

**Motion to Strike Supplemental Report of Friedemann (Doc. 172)**

Deep South moves to strike a supplemental report issued by Plaintiff's expert, Robert Friedemann.  Deep South argues that the supplemental report is untimely and contains information that was available to Friedemann at the time of his original report.  Deep South also argues that the supplemental report is an attempt by Plaintiffs to work in a new theory with new evidence.

Plaintiffs state that they retained Friedemann to provide expert testimony on the temperatures of surfaces within the engine compartment of an operating Hyster lift truck. Friedemann's original report was issued on October 8, 2012. The report describes testing performed on February 26-27, 2012 and purports to show exhaust temperatures rising to over 700 degrees (Feb. 26 testing) and in the vicinity of 600 degrees (Feb. 27 testing). Friedemann's report states that the temperature of the exhaust system exceeded the 450 degrees required to ignite paper. Friedemann obtained the 450 degree figure from Johnny Thornton.

Following the issuance of the Friedemann report, Plaintiffs took the deposition of Eric Benstock, Deep South's mechanical engineering expert. Benstock testified that the ignition temperature of copy paper in an unpiloted ignition was 842 degrees, and that the hot engine exhaust could not have started the fire.

In response to the Benstock testimony, Friedemann issued the supplemental report in question. The report mentions the 600-700 degree range discussed above. The other new parts of the report describe a test performed by Friedemann in a 1996 (the report includes a video of the 1996) test where he placed three types of paper around a Hyster lift truck exhaust pipe (heated to between 580-620 degrees) and observed flaming ignition within approximately five minutes.

Deep South's motion to strike is **granted in part and denied in part**. The court is not concerned with the new language describing the temperature range. The addition is insignificant at best; no new theories or opinions are offered.

However, the portions of the report that describe the 1996 testing and results thereof are stricken. This information was clearly available to Friedemann when he issued his original report, and it should have been obvious to anyone involved with this case that a key issue is whether a Hyster exhaust system can ignite paper. These aspects of the supplemental report are untimely by about a year; no testimony will be allowed by Friedemann regarding the 1996 testing and results.

**Motions to Strike Plaintiff's Expert Rebuttal Witness, Frederick Mowrer (Docs. 93 and 173)**

Deep South filed two motions to strike Plaintiffs' expert rebuttal witness, Frederick Mowrer. Docs. 93 and 173. The motions are joined in by NACCO. Doc. 112. The first motion seeks to strike Mowrer as an expert because, at the time of the filing of the motion, Mowrer had not provided a report as required by the scheduling order or Rule 26. The second motion was filed after Mowrer's report was issued. Deep South argues that the report is untimely; it goes beyond the description in Plaintiffs' expert disclosures; and it impermissibly comments on the video test performed by Friedemann in 1996.

Plaintiffs note that the court did not require the defense experts to tender reports until after the Plaintiffs' experts' depositions were taken. Plaintiffs state that they are simply seeking the same relief – as a matter of fairness. However, Plaintiffs did not approach the court and seek that relief in advance. Instead, Plaintiffs waited nearly a year after receiving Defendants' experts' reports to provide Mowrer's rebuttal report. That is simply too late

under this court's scheduling order. The motions to strike (Docs. 93 and 173) are **granted**. Mowrer's report and testimony will not be considered.

      THUS DONE AND SIGNED in Shreveport, Louisiana, this 24th day of September, 2014.

                                        Mark L. Hornsby
                                        U.S. Magistrate Judge